IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO: 2:09-cr-46-WHA |
| | ) | |
| RENARDO QUNTEZ PETTUS | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Currently pending before the Court is Defendant's Motion to Suppress (Doc. #11). On 14 May 2009, this Court held a hearing on Defendant's Motion. Defendant seeks to suppress "all evidence seized during the search or as a result thereof . . . any and all statements obtained as a result of the unlawful search." *Id*. at 5. Upon consideration of the Motion, the testimony at the evidentiary hearing, and the briefs, the undersigned RECOMMENDS the motion be DENIED.

**I.  BACKGROUND**

Based on the parties' briefs and testimony at the hearing held on 14 May 2009, and to a preponderance of the evidence,[1] the Court finds as follows:

On 20 April 2008, at approximately three forty-seven in the morning, Corporal Steven W. Horner (Officer Horner), a patrolman with the Montgomery Police Department, received a call from dispatch regarding gunshots in the area of Park Town Way. Officer Horner responded to the call and drove to the area where the shots were reported. Upon arriving, the

---

[1] The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

officer noticed a gray Chevrolet Tahoe driving without headlights on. As the officer approached the Tahoe, it made a right hand turn down a side street. The officer turned on the "blue lights" of his police vehicle and followed the Tahoe. The Tahoe turned into a nearby parking lot and Pettus began exiting the Tahoe.

The officer stopped, exited his vehicle, and approached Pettus as he was stepping out of the Tahoe. Officer Horner asked Pettus if he had heard any gunshots, to which Pettus said no. The officer asked Pettus to step in front of the Tahoe so the officer could pat Pettus down, for the officer's safety. As they were moving to the front of the vehicle, Officer Horner again asked Pettus if he had heard gunshots. This time Pettus admitted that he did hear gunshots. The officer then asked Pettus about the location of the shots and Pettus admitted that he had fired a gunshot because his girlfriend would not come out of her apartment, which was located on Park Town Way.

During the pat down, Officer Horner felt a bulge in Pettus's front pocket which the officer suspected to be folded money. Officer Horner asked Pettus what was in his pocket and Pettus stated that it was cash, in the amount of approximately four thousand dollars. Officer Horner then asked Pettus if there was anything in the Tahoe that the Officer should know about. Pettus then asked if he could be honest with Officer Horner. Officer Horner replied that it would be for the best. Pettus paused and then informed the officer that there was a pistol and marijuana in the vehicle. Officer Horner asked Pettus if he had a permit for the pistol and Pettus stated that his permit had expired.

Officer J.L. Carter arrived on the scene while Officer Horner was patting down Pettus and questioning him regarding the gun shots.[2] Officer Carter began looking inside the vehicle with a flashlight and spotted a backpack. After Pettus admitted there was a gun and marijuana in the Tahoe, Officer Carter asked Pettus if the marijuana was inside the backpack. Pettus said yes.

Officer Horner then asked Pettus if he could search the vehicle and Pettus consented. Pettus informed the officers that the keys to his Tahoe were inside his pants pocket and gave the officers permission to retrieve them. Once the officers had the keys, they placed Pettus in the back of Officer Horner's vehicle and attempted to unlock the Tahoe.

The officers were unable to unlock the Tahoe with the remote control keys. Every time the officers would push the button to unlock the doors, the locks would unlock and immediately relock.[3] Officer Carter retrieved an instrument designed to gain entry into a locked vehicle, referred to by the officers as a "slim jim." Officer Carter used the slim jim to open the Tahoe. Officer Carter retrieved the backpack and gave it to Officer Horner. Officer Horner opened the driver's side-door and retrieved an Interarms pistol and a spent shell casing. Officer Horner opened the backpack to find one-hundred-eight grams of marijuana, several plastic bags, and a set of scales.

---

[2] A so-called "canine officer" also arrived on the scene about that same time and asked Officers Horner and Carter if they had everything under control. After they indicated that they did, the "canine officer" left the scene.

[3] Pettus testified at the hearing that his remote key was broken.

Pettus was issued a warning ticket for the traffic violation and arrested for the gun and drug possession.

## II.   DISCUSSION

Prior to the hearing, in his brief, Pettus requested suppression by arguing that: (1) while the officers may have had probable cause to believe that Pettus's vehicle contained contraband, there were no exigent circumstances to conduct a warrantless search; and (2) the officers did not have enough reasonable suspicion to make a *Terry*[4] stop or "the 'minimal level' of justification necessary to question Mr. Pettus about the contents of his vehicle." (Doc. #11 at 2-4).

At the hearing on the Motion, Officer Horner and Pettus testified to two very different sets of facts. After the presentment of the evidence, Pettus conceded that the *Terry* stop was proper[5] and amended his first argument to aver that the officers lacked probable cause to search Pettus's vehicle.

This change in argument was based on the conflicting testimony between Officer Horner and Pettus. Specifically, Pettus testified as follows: his vehicle keys were not in his pocket, but locked in his truck; he did not give consent to search his vehicle; and he admitted there was a gun and marijuana in his vehicle only after the officers opened the Tahoe. Thus, Pettus argued the officers had no reason to search his vehicle.

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

[5] Counsel for Pettus specifically stated that the second issue (the *Terry* stop) was withdrawn.

Pettus admitted that if the Court believed the testimony of Officer Horner over the testimony of Pettus, specifically that he volunteered to the officers that he had drugs and a gun inside the Tahoe *before* they gained access to the inside of the vehicle and Pettus was in possession of his keys, then the officers had the right to search. Pettus also argued that even if the Court were to find that Pettus did tell the officers there was a gun and drugs in the vehicle, but also find that Pettus had locked his keys in the car, the officers were obliged to get a search warrant pursuant to *United States v. Alexander*, 835 F.2d 1406 (11th Cir. 1988).

Thus, the question before this Court is the reliability of Officer Horner's version of events verses that of Pettus. The Court will admit that upon the initial presentation of Officer Horner's testimony the Court had some questions about some of the officer's story. However, Pettus himself confirmed several of the odd events of the evening. Specifically, it was not until cross-examination of Officer Horner that the Court learned the officer used a "slim jim" to gain access to the vehicle. This information seemed incompatible with the officer's testimony that Pettus had consented to the search and had given permission for the officers to use his vehicle keys. The officer's explanation was that the remote keys were malfunctioning. Indeed, Pettus later took the stand and testified that the remote key wasn't working.

The officer also admitted that he did not detail in his incident report Pettus's statement that he had fired a gunshot. The Court might have expected that information to

5

have been put into an incident report. Yet, Pettus later took the stand and admitted that he had told Officer Horner that he fired the gun. Thus, the only areas of the officer's testimony the Court might have questioned were admitted by Pettus.

In contrast, the Court finds several elements of Pettus's testimony unreliable. As stated above, Pettus admitted on the stand that he informed the officers that he fired the gun while leaving his girlfriend's apartment. He later testified that he did not tell the officers that he fired a gun. He specifically testified that he had told the officers anything about the firing of a gunshot, yet earlier in his testimony he clarified that he did not tell the officers he shot at his girlfriend's house, but rather, shot the gun while leaving her house. Further, Pettus testified that he coincidentally pulled into the parking lot when the officer was making the stop and that Pettus did not see the officer, the patrol car, or the blue lights on the patrol car, until after Pettus had exited his vehicle and accidentally locked his keys in the Tahoe.

The Court heard the testimony in this matter, questioned Pettus, observed the demeanor of both witnesses, and finds that the testimony of Officer Horner was credible and the testimony of Pettus was not. Thus, the Court finds that Pettus admitted to possession of the marijuana and gun prior to the officers gaining entry into his vehicle and that Pettus consented to the search of his vehicle. Therefore, no violation of the Fourth Amendment occurred. *See e.g., United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004) (an officer may

ask for consent to search during a *Terry* stop.).[6]

Pettus argues that, even if the Court were to believe the testimony of the officers, pursuant to *United States v. Alexander*, 835 F.2d 1406 (11th Cir. 1988), the officers were required to get a search warrant to search Pettus's vehicle. However, *Alexander* is inapposite because unlike the defendant in *Alexander*, Pettus consented to the search and did not object when the officers gained access through the use of the "slim jim."

However, even if the Court were to assume that Pettus did not consent, the Court would still find the search was proper. The issue is whether the warrantless search of Pettus's vehicle violated the Fourth Amendment, which preserves the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. While the Fourth Amendment generally requires law enforcement officers to obtain a warrant supported by probable cause before conducting a search, one exception to the warrant requirement involves the search of automobiles. *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). Under the automobile exception, if "'a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'" *United States v. Watts,* 329 F.3d 1282, 1285 (11th Cir. 2003) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)). Thus, "there are only two questions that must be answered in the affirmative before authorities may conduct a warrantless search of an automobile. The

---

[6] Pettus does not challenge the voluntariness of the consent, because he argues that consent was never given.

first is whether the automobile is readily mobile . . . The second prong of the test, probable cause, is determined under the facts of each case." *Watts*, 329 F.3d at 1286.

While Pettus conceded the issue of probable cause if the Court believes the testimony of the officers, he does argue that because the keys to the vehicle were locked inside, or the keys given to the officers were incapable of opening the vehicle,[7] the vehicle was not readily mobile. However, "[a]ll that is necessary to satisfy [the requirement of mobility] is that the automobile is operational." *Id*. (citing *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir.1990)). Ready mobility is "inherent in all automobiles that reasonably appear to be capable of functioning." *Id*. at 1285.

Pettus admitted that he drove his vehicle that night and thus his vehicle was indeed operational. It matters not if that he may have been locked out. The justification to conduct a warrantless search "does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir.1990) (quoting *Michigan v. Thomas*, 458 U.S. 259, 261 (1982)); *see also United State v. Odom*, 2008 WL 4693331 *4 (S.D. Fla. Sep. 11, 2008) (finding the requirement of mobility satisfied where all suspects were in custody and police had possession of vehicle keys).

---

[7] Again, this is assuming that consent was not given.

Even the case cited by Pettus supports this conclusion. The Court in *Alexander* found exigent circumstances existed where the Government alleged that because the vehicle was not registered to Alexander and the true owner could have driven the car away. *Id.* at 1410. In the present case, Pettus admitted that there was another set of keys to his Tahoe at home. "While the evidence of exigency is not overwhelming, this Court's precedents do not require overwhelming exigency." *Id.* (citing *United States v. McBee*, 659 F.2d 1302, 1306 (5th Cir. Unit B 1981) (police were justified in conducting a warrantless search of a car that they had already impounded because the mobility problem, though slight, continued to exist)). Thus, even were the Court to assume that Pettus did not consent to the search of his vehicle, the Court would still find the search of his vehicle was proper under the automobile exception to the warrant requirement.

### III. CONCLUSION

Accordingly, for the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Pettus's Motion to Suppress (Doc. #11) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before 15 June 2009**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 2nd day of June, 2009.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE